IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM T. DIVANE, | ) | |
| *et. al.*, as the ELECTRICAL | ) | |
| INSURANCE TRUSTEES | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 11 CV 4915 |
| | ) | |
| v. | ) | |
| | ) | |
| DUNNING ELECTRICAL SERVICES, | ) | MAGISTRATE JUDGE |
| INC., | ) | ARLANDER KEYS |
| | ) | |
| Defendant. | ) | |

## Memorandum Opinion and Order

Plaintiffs in this case are the appointed and acting
trustees under an agreement originally entered into on June 24,
1930, between the Electrical Contractors' Association of City of
Chicago ("ECA") and Local 134, International Brotherhood of
Electrical Workers ("I.B.E.W." or "Local 134"), and are known as
the Electrical Insurance Trustees (Plaintiffs or the "Trustees").
On July 21, 2011, they sued, under the Employee Retirement Income
Security Act of 1974 ("ERISA"), to recover unpaid and delinquent
fringe-benefit contributions from Dunning Electrical Services,
Inc. ("Dunning"), an electrical contractor. Plaintiffs amended
their complaint on November 4, 2011. In the amended complaint,
Plaintiffs allege that Dunning did not satisfy its contribution
obligations and seek a money judgment from Dunning for unpaid
contributions and an order that Dunning be enjoined from
performing bargaining unit work in the jurisdiction of Local 134.

The parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on September 28, 2011. Thereafter, Plaintiffs filed a motion for summary judgment and a motion to strike one of Defendant's affidavits. Both motions have been fully briefed.

## Facts & Procedural History

Dunning, an electrical contractor, signed a Letter of Assent effective June 29, 2005, and thereby agreed to the terms of a collective-bargaining agreement entered into between the ECA and Local 134 (the "Principal Agreement"). Plaintiffs' Rule 56.1 Statement, ¶4. Dunning signed a separate Letter of Assent effective June 29, 2005, and thereby agreed to the terms of a collective bargaining agreement entered into between the ECA and Local 134 called the "Residential Agreement." *Id.* at ¶5. Dunning also entered into a Sign Agreement with Local 134 on July 1, 2008. *Id.* at ¶6.

Under the Principal Agreement, Dunning agreed to pay certain wage rates and, in addition, to file a monthly report and make a monthly contribution to the Trustees to cover certain fringe benefits. Plaintiffs' Rule 56.1 Statement, ¶7. Section 16.01 of the Principal Agreement provides:

> The Employer shall furnish two bonds, each with corporate surety, one to guarantee the payment of wages with the Union as "obligee" and the other to guarantee the payment of fringe benefit contributions with the Electrical Insurance Trustees as "obligee." The wage bond shall be on a standard form provided by the Union (an example is included in

2

> Appendix A of this Agreement); the fringe benefit bond shall
> be on a standard form provided by the Electrical Insurance
> Trustees (an example is included in Appendix B of this
> Agreement). The penal sum for contributions payable to the
> Electrical Insurance Trustees as obligee shall be Ten
> Thousand Dollars and 00/100 ($10,000) for each covered
> Employee of the Employer for all fringe benefit
> contributions to the obligee and any liquidated damages
> assessed thereon. The Penal sum for contributions payable to
> the National Electrical Benefit Fund shall be $3,000. The
> wage bond shall provide for full payment of wages to a
> maximum of four weeks of wages. There shall be no deductible
> on either bond.

Complaint at ¶9. The Residential Agreement and the Sign Agreement have bond requirements similar to those in the Principal Agreement. *Id.* at ¶10.

The Trustees administer numerous health and welfare and pension plans for the benefit of the members of Local 134, I.B.E.W, and their families. Madix Aff. At ¶2. The Trustees receive fringe benefit contributions from approximately 900 different employers. *Id.* at ¶3. The plans administered by the Trustees operate on a self-reporting system; that is, the employers who contribute to the various funds administered by the Trustees identify the employees for whom contributions are owed and state hours worked and wages earned by the employees. *Id.* The Trustees, in turn, police the self-reporting by conducting periodic audits of each employers' records. *Id.*

On December 13, 2010, C.W. Olson & Co., the agent for Dunning's surety, Benefit Security Insurance Company ("BSIC"), which provided the fringe benefit bonds for Dunning to cover its

obligations under the Principal Agreement, the Residential Agreement, and the Sign Agreement, informed the Trustees that the bonds issued by BSIC would be canceled effective January 13, 2011. Plaintiffs' Rule 56.1 Statement, ¶12. Dunning admits that it did not replace the fringe benefit bonds canceled by BSIC. Defendant's Response to Plaintiffs' Rule 56.1 Statement, ¶13.

The Trustees allege that Dunning has not submitted a monthly payroll report to the Trustees for the Principal Agreement since September, 2010 and has not submitted a monthly payroll report for the Sign Agreement since October, 2010. Plaintiffs' Rule 56.1 Statement, ¶¶14-15.

In 2012, the Trustees conducted an audit of Dunning's books and records, covering the period from January 1, 2011, through December 31, 2011 (the "audit"). Plaintiffs' Rule 56.1 Statement, ¶11. According to the Trustees, the audit showed that Dunning owes the Trustees $126,598.86 in delinquent fringe benefit contributions, plus liquidated damages in the amount of $26,133.69, and an audit fee of $750.00. *Id.*; Krantz Aff., ¶3. After all just credits and set-offs, Plaintiffs claim Dunning owes the Trustees $157,522.15. Krantz Aff., ¶3.

Dunning admits that it ceased making contributions to all pension plans and has not submitted monthly contribution sheets since November 2010, because of a financial inability to pay. Defendant's Rule 56.1 Statement, ¶4.

Plaintiffs filed their motion for summary judgement on
September 17, 2012. In response, Dunning filed its response brief
which included Jerome Sufranski's affidavit. [46] Next,
Plaintiffs filed their reply in support of their motion for
summary judgment, which included affidavits of Nick Nigliazzo and
Michael Krantz. Shortly thereafter, Defendant filed a motion to
strike portions of Plaintiff's Reply Brief, including Mr.
Nigliazzo's affidavit and portions of Michael Krantz's
supplemental affidavit.

On November 14, 2012, the Court ruled on Defendant's motion
to strike, striking Nick Nigliazzo's affidavit and the supporting
documents and denying Defendant's request to strike exhibit A of
Mr. Krantz's supplemental affidavit. [53] At that time, the Court
granted Defendant leave to file a sur-reply to the motion for
summary judgement limited to exhibit A to Michael Krantz's
supplemental affidavit.

Then, Plaintiffs filed a motion to strike Mr. Sufranski's
affidavit, which Defendant had filed in support of its response
to the motion for summary judgement. Therefore, pending before
the Court is Plaintiff's motion for summary judgment and
Plaintiff's motion to strike the affidavit of Jerome Sufranski,
both now fully briefed. As the motion to strike affects the
information to be considered in the motion for summary judgment,
the Court will address that motion first.

## Discussion

### I.   Motion to Strike

Plaintiffs request that the Court strike the affidavit of Jerome Sufranski, which Defendant filed in support of its response to the motion for summary judgement. Mr. Sufranski is one of Dunning's partial owners. Plaintiffs argue that the affidavit should be stricken, because Dunning never produced the payroll reports attached to Mr. Sufranski's affidavit as Exhibit A, and because Mr. Sufranski does not have personal knowledge to attest to the information in the affidavit.

Pursuant to Federal Rule of Civil Procedure 26(e)(1), if a party learns that its Rule 26(e) disclosures or written discovery responses are incomplete or incorrect in some material respect, the party must supplement or correct the disclosure or response in a timely manner. Violations of Federal Rules of Civil Procedure 26(a)(1)(A) and 26(e)(1) are addressed by Federal Rule of Civil Procedure 37(c)(1), which provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."

Plaintiffs state that Dunning never produced the monthly payroll reports attached to Mr. Sufranski's affidavit as Exhibit

A. Mot. to Strike at pp. 2-3. In response to the motion for summary judgement, Dunning attempts to rely on these documents in support of its assertion that it submits one monthly contribution sheet to the Trustees for all employees and all Pension Plans, regardless of whether the work was performed under the Principal or Sign Agreements. Defendant's Rule 56.1 Statement, ¶¶1-2.  On November 8, 2011, the Trustees served Dunning with a Rule 34 Request for Production of Documents. Request No. 1 asked for all employment records of Dunning, including "payroll reports submitted to the Electrical Insurance Trustees and any other union fund." In response, Dunning stated: "Defendant objects on the grounds that the interrogatory [sic] is over-broad in terms of scope. Notwithstanding said objection, see documents DE000001-000419 produced." The documents in Exhibit A to Mr. Sufranski's affidavit were not included in the 419 documents produced by Defendant. Since the documents attached as Exhibit A to Mr. Sufranski's affidavit have not previously been produced in this litigation, pursuant to Federal Rule of Civil Procedure 37(c)(1), they are stricken and will not be considered in the Court's ruling on Plaintiffs' motion for summary judgment.

Plaintiffs also request that the Court strike Mr. Sufranski's affidavit on the basis that he does not have personal knowledge of Dunning's business for the period after February 2011, as he retired in February 2011. Mot. to Strike at pp. 3-5.

Federal Rule of Civil Procedure 56(c)(4) provides that affidavits "must be made on personal knowledge" and must show that the affiant "is competent to testify on the matters stated." Mr. Sufranski did retire in February 2011. Jerome Sufranski Dep., p. 9. In support of their argument, Plaintiffs cite a Dunning employee Radoslav Busljeta's deposition in which he stated that he hadn't seen any of the Sufranskis at the office "for a long, long time." Radoslav Busljeta Dep., p. 11.

Specifically, Plaintiffs argue that Mr. Sufranski, having retired in February 2011, would not have personal knowledge to the information in ¶¶10-12 of his affidavit, in which he states: "Dunning utilizes several non-electrical workers in order to complete the daily operations of its business. From February 2011 through August 2011, Dennis Shuler was not working for Dunning as an electrician. Rather, during that time Mr. Shuler was employed as a warehouse worker and was not performing any electrical work."

Defendant responds that, even though Mr. Sufranski retired in February 2011, his financial stake in the company has not changed and "as a partial owner he remains apprised of company affairs and practices, and the contents of his Affidavit are based on his personal knowledge as a partial owner of Defendant." Resp. to Mot. to Strike at p. 3. In his deposition, Mr. Sufranski stated that with regard to Dunning, he is basically doing the

same things he did now as he was doing before he retired. Jerome Sufranski Dep., p. 9. Therefore, the Court finds that Mr. Sufranski has the personal knowledge to attest to the information in his affidavit.

Plaintiffs' motion to strike is granted in part and denied in part. Exhibit A to Mr. Sufranski's affidavit is hereby stricken. However, Plaintiffs' request to strike additional paragraph's of the affidavit is denied.

Therefore, based on the Court's findings on the two motions to strike filed in this case, in ruling on the motion for summary judgement, the Court will not consider the documents in Exhibit A to the Affidavit of Jerome Sufranski filed in support of Defendant's Response to the motion for summary judgment or the affidavit of Nick Nigliazzo, or the supporting documents to the same, which Plaintiffs attached to their Reply Brief.

## II. Motion for Summary Judgement

Based upon the factual record, Plaintiffs moved for summary judgment on their amended complaint. They argue that Dunning breached its obligation to provide fringe benefit bonds, owes the delinquent contributions set forth in the audit, and, because Plaintiffs had to initiate this action to collect these sums, Dunning unquestionably owes the interest and penalties (including liquidated damages, attorneys' fees and costs).

Summary judgment is appropriate when "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, the Court does not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). The Court views all evidence and draws all inferences in favor of the non-moving party, and may enter summary judgment only if the record as a whole establishes that no reasonable jury could find for the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).

In order to successfully oppose a motion for summary judgment, the nonmoving party must do more than raise a metaphysical doubt as to the material facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586. (1986). Rather, they must come forward with specific facts showing that there is a genuine issue for trial. *Id.* at 587. The nonmoving party must offer more than a mere scintilla of evidence to survive summary judgment, and conclusory allegations are insufficient to defeat a motion for summary judgment. *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F. 3d 620, 628 (7th Cir. 2006).

Here, under the Principal Agreement, the Residential Agreement, and the Sign Agreement, Dunning agreed to pay certain

wage rates and, in addition, to file a monthly report with and make a monthly contribution to the Trustees to cover certain fringe benefits. Under ERISA, "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or agreement." 29 U.S.C. §1145. ERISA further provides that

> [i]n any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan –
> (A) the unpaid contributions,
> (B) interest on the unpaid contributions,
> (C) an amount equal to the greater of-
>     (i)  interest on the unpaid contributions, or
>     (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
> (D)  reasonable attorney's fees and costs of the action, to be paid by the defendant, and
> (E)  such other legal or equitable relief as the court deems appropriate.

29 U.S.C. §1132(g)(2).

Plaintiffs allege that no genuine issues of material facts exist and that judgment should be entered in favor of Plaintiffs in the amount of $157,552.15. In addition, the Trustees also request the affirmative relief of entry of an order enjoining Dunning from engaging in work within the scope of the work clause

in the Principal Agreement or the Sign Agreement, and within the jurisdiction of Local 134, I.B.E.W., for as long as it is a signatory of those agreements, unless and until it furnishes the Trustees with duly-executed standard fringe-benefit bonds.

Dunning argues that the record reflects that genuine issues of material fact exist as to whether the unpaid contributions claimed by Plaintiffs are in fact due and owing. Additionally, Dunning argues that a genuine issue of material fact exists as to whether Dunning has been denied the ability to obtain a bond by Plaintiffs' own actions. Finally, Defendant argues that Plaintiffs' request for an injunction should be denied because a genuine issue of material fact exists as to whether there are any collective bargaining agreements in effect requiring a posting of a surety bond given Dunning's alleged withdrawal from Pension Plan No. 4.

### A.   Genuine Issue as to Amount Owed

The Trustees argue that they are entitled to summary judgment because the undisputed facts establish that Dunning was contractually obligated to make contribution payments each month for covered employees, that Dunning employed covered employees, yet failed to make all the required payments.

To support their motion for summary judgement, Plaintiffs have offered evidence including the three agreements that the parties entered into and the audit showing that Dunning did not

meet its obligations of those agreements. In his declarations, Mr. Kratz represents that the Trustees had an audit completed of Dunning's books and records, covering the period from January 1, 2011, through December 31, 2011. Krantz Aff., pp. 2-3. The Trustees set forth that the audit showed that after all just credits, Dunning underpaid contributions due under the Principal Agreement and the Sign Agreement in the amount of $130,668.46. Krantz Aff., ¶3. In addition, the Trustees set forth that the undisputed facts show that under the Principal Agreement, Dunning is also liable for interest, liquidated damages, and an audit fee. *Id.* Specifically, liquidated damages in the amount of $26,133.69, and an audit fee of $750.00. *Id.*

In response to the motion, Defendant argues not only that there is a genuine issue for trial as to the amount of contributions owed by Dunning, but it also argues that the evidence may show that Dunning does not owe any of the contributions alleged in light of the fact that it withdrew from Pension Plan No. 4 as of February 2011. Sufranski Aff., ¶¶7-12.

Dunning acknowledges that it entered into three collective bargaining agreements with Local 134: the Principal Agreement, the Sign Agreement, and the Residential Agreement. According to the Trustees, the Sign Agreement shows that Dunning was obligated to contribute (for 2008 and 2009) $94.00 per week to the Joint Pension Trust (i.e., Pension Plan No. 4); for the same period,

Dunning was required to contribute $2.59 per hour to Pension Plan No. 5. Krantz Supp. Aff., ¶4. And, the Trustees represent that under the Principal Agreement (for 2009 and 2010), Dunning was obligated to contribute a percentage of its payroll to cover health and welfare benefits and Local Pension (i.e., Pension Plan No. 2); it also was required to contribute $2.65 per hour to the Annuity Plan (Pension Plan No. 5). Krantz Supp. Aff., ¶5.

Dunning argues that, because the evidence shows that it withdrew from Pension Plan No. 4 during the period of the audit, it may have been relieved of all of its obligations to pay contributions under both the Principal and Sign Agreements, under which the Trustees claim money is owing. In support of this argument, Dunning provides correspondence dated March 20, 2012 from Plaintiffs stating, "According to our records, effective February 1, 2011 Dunning Electrical Services, Inc. (the Company) has withdrawn from the Electrical Contractors Association of the City of Chicago and Local Union 134, I.B.E.W. Joint Pension Trust of Chicago Pension No. 4 (the Plan)." Sufranski Aff. at Ex. B.

The Trustees argue that Dunning's termination of operations under the Sign Agreement, and consequent withdrawal from Pension Plan No. 4, has no effect on its obligations under the Principal Agreement or Pension Plan No. 2. Reply at p. 2. Dunning reasons that "if it withdrew, then its obligations to submit monthly payroll reports to the Trustees ceased as of that date. Dunning

has not submitted contribution sheets since November 2011 because it is currently paying withdrawal liability, which would obliterate the need for filing monthly contribution sheets." Resp. at p. 4. Dunning also argues that, if it withdrew from Plan No. 4, it must also have withdrawn from the other Plans to which it belonged. *Id.* At this stage of the litigation, the Court will not weigh the evidence or determine the truth of the matters asserted, but after viewing the evidence and drawing all inferences in favor of the non-moving party, there is a genuine issue for trial as to which of the three agreements were in place during the audit period, and thus the amount of the monetary damages claimed that Dunning owes, if any.

Next, Defendant argues that, even if there is no issue as to the fact that the three agreements were in place during the audit period, there is still an issue for trial regarding the amount the Trustees claim. Dunning argues that not all the employees that were considered covered employees in the audit in calculating the amount due, were actually covered employees. Mr. Sufranski represents that "the unpaid contribution amounts claimed by Plaintiffs as being due and owing from Dunning include work performed by at least one individual who was not performing electrical work for Dunning during the entire time frame covered by the audit." Sufranski Aff., ¶9.

Dunning explains that it utilizes several non-electrical

15

workers in order to complete the daily operations of its business. Sufranski Aff., ¶10. Mr. Sufranski represents that, from February 2011 through August 2011, Dennis Shuler was not employed by Dunning as an electrician. Sufranski Aff., ¶11. Rather, he was employed as a warehouse worker. Sufranski Aff., ¶12. Despite this, Plaintiffs' audit report includes Mr. Shuler as having required contributions to have been made on his behalf. Krantz Aff., ¶3 and Ex. A.

In response, the Trustees argue that there is no issue of fact as to whether Dunning owes contributions for employee Dennis Shuler, because he is an electrician. In support of this argument, the Trustees point to a screen shot of Dunning's current web page on which Mr. Shuler is listed as the after-hours emergency contact for the electrical company and Mr. Sufranski's deposition testimony, which confirms that Mr. Shuler is an electrician. Reply at pp. 3-5. Specifically, the Trustees point to part-owner Mr. Sufranski's testimony:

When asked about employees other than Mr. Wikary, Mr. Busljeta and Mr. DeLatorre, Mr. Sufranski testified:

    Q. Any other employees?
    A. Two, yes two electricians.
    Q. What are those electricians' names?
    A. Dennis Shuller [sic] and Jerry Rodriguez.

Jerome Sufranski Dep., p. 12.

Jerome Sufranski also testified that, since the Local 134 members left Dunning, Mr. Shuler is doing electrical work in Cook

County and does not work in the office. Jerome Sufranski Dep.,
pp. 38-39; 40-41. The Trustees argue that the Court should ignore
the "self-serving" representations in Mr. Sufranski's affidavit,
because it contradicts his deposition testimony, citing *Beckel v.
Wal-Mart Assocs.*, 301 F.3d 621, 623 (7th Cir. 2002)(Affidavits
signed under oath "when offered to contradict the affiant's
deposition are so lacking in credibility as to be entitled to
zero weight in summary judgment proceedings unless the affiant
gives a plausible explanation for the discrepancy." ). However,
the Court does not view Mr. Sufranski's affidavit as
contradicting his deposition testimony since during his
deposition, Mr. Sufranski admitted that Dennis Shuler is a
trained electrician and has worked as an electrician for Dunning,
including after the Local 134 members stopped working for
Dunning, but Mr. Sufranski did not testify specifically as to Mr.
Shuler's duties during the time period evaluated in the audit.
Therefore, the Court takes into consideration Mr. Sufranski's
representations regarding Mr. Shuler in his affidavit. In
addition, Dunning's current web page does not contradict the job
representations in Mr. Sufranski's affidavit, as there is no
information on it regarding Mr. Shuler's responsibilities during
the audit period.

Again, the Court will not weigh the evidence at this stage
of the litigation. Since there is an issue of fact as to whether

17

Dunning owes contributions for its employee Mr. Shuler, as set forth in the audit report, the motion for summary judgment fails as there is a genuine issue for the trier.

Next, Dunning argues that a genuine issue of material fact exists as to whether it has breached its obligation to provide a fringe benefit bond to the Trustees, because Dunning's position is that it has been denied the ability to obtain a bond by Plaintiffs' own actions. Under ERISA Section 406(a)(1)(B) [29 U.S.C. § 1106(a)(1)(B)], a benefit plan cannot extend credit to a party in interest, such as Dunning, a contributing employer. The Department of Labor has created certain exceptions to the rule. Prohibited Transaction Class Exemption No. 76-1 allows a multiemployer plan to enter into payment plans with delinquent employers without violating ERISA. See, e.g., *John Boettcher Sewer & Excavating Co. v. Midwest Operating Engineers Welfare Fund*, 803 F. Supp. 1420, 1424 (N.D. Ind. 1992). But ERISA doesn't require funds to enter into payment plans with failing businesses. Here, Dunning contends that a genuine issue of fact exists as to whether Dunning's bond was denied by the fund, because the Trustees have refused to enter into a payment plan with Dunning, thus making it a failing business.

C.W. Olson & Company was the agent for Dunning's surety and provided fringe benefit bonds for Dunning under the terms of the Principal, Residential and Sign Agreements. Krantz Aff., ¶4. It

is undisputed that, on January 13, 2010, C.W. Olson cancelled Dunning's bond due to the allegedly unpaid contributions pursuant to these three Agreements. Sufranski Aff., ¶14. As of April 23, 2012, Dunning paid back the amount owed in full ($200,000.00) to C.W. Olson & Company. Sufranski Aff., ¶15 and Ex. C attached thereto. In its letter of April 23, 2012, C.W. Olson indicated that "[w]e would be willing to underwrite your company if you were interested in acquiring bonds for Dunning Electrical Services, Inc. in the future." Sufranski Aff., ¶16. C.W. Olson's Matthew Meliker, the Executive Vice President and General Counsel, stated further, "Your company, your employees, and your personal guarantors are men of their word regarding paying everything back and it is much appreciated. I wanted to personally thank you as both sides saved money having not spent on attorney fees, court costs, service fees, etc." Sufranski Aff. ¶17. Despite this and Dunning's attempts to be rebonded, it has been unable to obtain a bond from C.W. Olson. Sufranski Aff., ¶18. Dunning argues that a genuine issue of material fact exists as to whether the bond has been denied because of Plaintiffs' actions – their refusal to enter into a payment plan with Dunning to resolve the delinquencies that are the subject of this litigation. Dunning notes that the management trustees of the fringe benefit funds are direct competitors of Dunning. Sufranski Aff. ¶19.

In response, the Trustees acknowledge that under ERISA there are options for Dunning to be rebounded, despite their previous delinquencies in paying. Reply at p. 5. However, the Trustees argue that "ERISA doesn't require funds to enter into payment plans with failing businesses." *Id.* Dunning recognizes this response, but its argument is that the Trustees have contributed to the cause of its breach, and the Trustees do not show evidence that a trier of fact would not find in favor of Dunning on this issue. There is an issue for the trier of fact regarding Dunning's defense that the Trustees are responsible for its breach to provide a fringe benefit bond and this issue will not be resolved on summary judgement.

As there are issues of material fact as to whether Dunning owes the contributions alleged in Plaintiffs' Second Amended Complaint and whether the Trustees' refusal to enter into a payment agreement with Dunning has caused its continued breach by not supplying fringe benefit bonds, Plaintiffs' Motion for Summary Judgment must be denied.

**B.    Genuine Issue as to Injunctive Relief Requested**

The Trustees argue that, because Dunning has not submitted payroll reports to the Trustees for two years and already owes the Trustees over $150,000, it should not be permitted to continue to run up debts which the Trustees will be unable to collect. They represent that the only way to protect the Trustees

from incurring uncollectible liabilities is by enjoining Dunning from performing bargaining-unit work. Mem. Mot. for SJ, at p. 4.

In response, Dunning argues that Plaintiffs' request for an injunction should be denied, because a genuine issue of material fact exists as to whether there are any collective bargaining agreements in effect requiring a posting of a surety bond given Dunning's alleged withdrawal from Pension Plan No. 4, and whether its failure to post a bond is at least partially caused by the Trustee's actions. As discussed above, there are genuine issues of material fact regarding these issues. Therefore, the Trustees' request for injunctive relief is denied. Plaintiffs' motion for summary judgment is denied and all issues are to be resolved on their merits at trial.

## IV. Conclusion

For the reasons set forth above, the Court grants in part and denies in part Plaintiffs' motion to strike and denies Plaintiffs' motion for summary judgment. While this is a close call for summary judgment on behalf of Plaintiffs, there are material issues of fact which preclude the Court from granting summary judgment and which require a trial.

Date: April 5, 2013          E N T E R E D:

_____

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT